**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 45202**

| | |
|---|---|
| (ELLEN) GITTEL GORDON, <br><br>     Plaintiff-Appellant, <br><br> v. <br><br> U.S. BANK NATIONAL ASSOCIATION, J.P. MORGAN LOAN TRUST 2006-03 company, LISA McMAHON-MYHRAN, SELECT PORTFOLIO SERVICING, INC., <br><br>     Defendants-Respondents, <br><br> and <br><br> JOHN DOES 1-10, <br><br>     Defendants. | Boise, May 2019 Term <br><br> Filed: August 28, 2019 <br><br> Karel A. Lehrman, Clerk |

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Blaine County. Jonathan Brody, District Judge.

The amended judgment of the district court is <u>affirmed</u>.

Ellen Gittel Gordon, appellant *pro se*.

Parsons Behle & Latimer, Idaho Falls, for respondents U.S. Bank National Association, J.P. Morgan Loan Trust, Lisa McMahon-Myhran, and Select Portfolio Servicing, Inc. Jon A. Stenquist argued.

———————————

STEGNER, Justice.

After Ellen Gittel Gordon (Gordon) defaulted on her mortgage, the loan servicer initiated nonjudicial foreclosure proceedings to sell her home at auction. Gordon submitted multiple loan modification applications and appeals in an attempt to keep her home but all were ultimately rejected. As a result, Gordon initiated the underlying action in district court to enjoin the foreclosure sale. Upon the filing of a motion to dismiss that was later converted to a motion for summary judgment, the district court dismissed Gordon's action and allowed the foreclosure sale

1

to take place. Gordon timely appealed. For the reasons that follow, we affirm the district court's dismissal of Gordon's complaint.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On February 28, 2006, Gordon borrowed $1.44 million from MortgageSelect, a corporation organized and operating in the State of New York, to purchase a home in Ketchum, Idaho (the property). Gordon signed a promissory note to that effect (the note), which included an adjustable interest rate. Gordon's initial monthly payment was $7,050. The note was secured by a Deed of Trust (trust deed), also executed by Gordon on the same date. The trust deed identified Sun Valley Title Company as the trustee and Mortgage Electronic Registration Systems, Inc. (MERS) as MortgageSelect's successor and the beneficiary under the trust deed.

At some point, JPMorgan Chase Bank (Chase) began servicing the loan and Gordon made her payments to it. Gordon eventually experienced a drop in income that coincided with a drop in the value of the property. Consequently, Gordon sought to modify her mortgage through Chase. According to Gordon, in June 2012, a Chase loan modification processor advised her to stop making her monthly payments in order to initiate the modification process. Hoping to initiate a loan modification, Gordon made her last payment in May of 2012, which resulted in her defaulting on the mortgage in June 2012. The record does not contain the details of this initial attempted modification with Chase, but it is clear it was unsuccessful.

On November 7, 2012, the note was assigned to U.S. Bank as trustee of J.P. Morgan Alternative Loan Trust 2006-A3 Mortgage Pass-Through Certificates (J.P. Morgan Loan Trust), a mortgage-backed security pool. The trust deed was also assigned to U.S. Bank in its capacity as trustee of J.P. Morgan Loan Trust. (For ease of reference, "U.S. Bank" will be used to refer to the beneficiary of the note and the holder of the trust deed.)

On August 1, 2013, Select Portfolio Servicing, Inc. (SPS), began servicing Gordon's loan. Gordon then began attempting to modify her mortgage through SPS. Because Gordon still had made no payments since May 2012, a foreclosure sale was scheduled for August 15, 2014. The date for the scheduled sale came and went without the sale occurring.

Gordon sought to sell the property to avoid foreclosure. On April 17, 2014, she had her loan evaluated for a payment plan that would allow her to sell the property; however, she was ineligible for the plan due to the delinquency of her mortgage. Later, on July 15, 2014, Gordon submitted a short sale offer to SPS for its review. Gordon withdrew that submission on August

2

12, 2014, hoping to obtain a better offer for the property. Evidently, this maneuver postponed the scheduled August 15, 2014, foreclosure sale because on October 22, 2014, Gordon submitted an Assistance Review Application (or loan modification application) to SPS for review of "all foreclosure prevention options."

On May 7, 2015, SPS sent a letter to Gordon denying her first modification application and informing her she could appeal the denial or notify SPS of any errors. On May 13, 2015, Gordon submitted a notice of error regarding the May 7, 2015, denial, citing SPS's failure to include income from her trust. Gordon also requested a postponement of the foreclosure sale.

On June 12, 2015, SPS wrote to Gordon to inform her there had been no error and her income had been calculated correctly based on the information she had provided. In a later letter, SPS clarified that it did not receive proof of Gordon's trust income with the May 13, 2015, notice of error or with the original application; thus, the calculation had been accurately based on the amount of income Gordon had provided. SPS then affirmed the May 7, 2015, denial, noted that a foreclosure sale was scheduled for June 30, 2015, and informed Gordon that if she wished to have her account reevaluated, she would need to submit a new application.

As a result of this denial, Gordon filed a complaint with the Consumer Financial Protection Bureau (CFPB). The complaint alleged that SPS had engaged in dual tracking[1] and failed to properly review Gordon's modification application. By August 18, 2015, SPS had received correspondence from the CFPB relaying the information about Gordon's complaint. On August 26, 2015, SPS wrote to Gordon's attorney, Scott Rose (Rose). In that letter, SPS denied committing any improper dual tracking and noted that no foreclosure sale was scheduled. (Apparently, SPS must have cancelled the June 30, 2015, sale.) Subsequently, SPS accepted a second Assistance Review Application from Gordon.

On September 15, 2015, SPS denied this second loan modification application, sending Gordon a form denial stating there were no loss mitigation options available to her. This second denial was largely identical to the May 7, 2015, denial; however, this second denial stated that a modification was unavailable because a payment equal to 31% of Gordon's reported income could not be effectuated without impermissibly changing the terms of the loan. Prompted by

---

[1] "Dual tracking is the term given to situations in which the lender actively pursues foreclosure while simultaneously considering the borrower for loss mitigation options. [12 C.F.R.] Section 1024.41(g) prohibits dual tracking, and [12 C.F.R. section] 1024.41(a) expressly provides for a private right of action in the event the lender violates the provision." *Gresham v. Wells Fargo Bank, N.A.*, 642 Fed. App'x 355, 359 (5th Cir. 2016) (citation footnotes omitted).

Gordon's subsequent communication with U.S. Bank, SPS sent an explanatory letter to Rose on September 17, 2015. The letter clarified that although an initial error had been made in calculating Gordon's income, the September 15, 2015, denial was based on a recalculation done on September 11, 2015, which included Gordon's trust income. Accordingly, SPS clarified that the most recent denial remained in effect, despite Gordon's accurate monthly income, which included her monthly trust income of $9,681.75.

Gordon continued to have questions about this second denial and corresponded with SPS yet again; Gordon alleged that SPS had violated the Dodd-Frank Act by engaging in dual tracking. SPS responded on November 19, 2015, admitting that the first, May 7, 2015, denial had been erroneously predicated on an incorrect income. Regardless, SPS provided additional information on why its second denial on September 15, 2015, was proper even when considering Gordon's $9,681.75 monthly trust income. Gordon, still unsatisfied, requested another Assistance Review Application. SPS sent the third requested application to Gordon on February 18, 2016.

On January 28, 2016, SPS, as U.S. Bank's attorney-in-fact, appointed Lisa McMahon-Myhran (McMahon-Myhran) as the trustee of the trust deed. On August 31, 2016, McMahon-Myhran recorded a Notice of Default declaring all sums due and announcing U.S. Bank's intent to foreclose the trust deed by sale at public auction.[2] On September 6, 2016, McMahon-Myhran also executed a Trustee's Notice of Sale, which announced that the property would be sold at public auction at the front steps of the Blaine County Courthouse, in Hailey, Idaho, on January 11, 2017. The Notice of Trustee's Sale and other notices were posted on the property September 28, October 8, and October 17, 2016. The Notice of Trustee's Sale was also published in the local newspaper.

Almost ten months after Gordon received her third modification application, SPS alerted Gordon on December 7, 2016, that the third application had not been completed within the given timeline and closed her request. On January 5, 2017, Gordon contacted SPS regarding this latest denial, sending SPS an undated appeal and a notice of error dated that same date.

On January 9, 2017, just two days before the scheduled foreclosure sale, Gordon filed her complaint in district court against J.P. Morgan Loan Trust, U.S. Bank, McMahon-Myhran, and

---

[2] McMahon-Myhran recorded an initial Notice of Default on March 25, 2016. However, this notice was rescinded on August 23, 2016.

4

SPS (collectively Lenders). The complaint contained eleven counts, requested the foreclosure sale be vacated and enjoined, and sought damages for alleged violations of the Dodd-Frank Act, Idaho Code, and the trust deed. Gordon filed a simultaneous motion for a temporary restraining order (TRO), requesting the January 11, 2017, foreclosure sale be halted.

On January 11, 2017, the date of the noticed foreclosure sale, SPS postponed the sale until February 9, 2017. On February 9, 2017, the sale was once again postponed and rescheduled for March 9, 2017. However, Gordon claims this postponement was never properly announced. On March 9, 2017, the sale was again postponed until April 6, 2017.

On March 10, 2017, the Lenders filed a notice of hearing, asking for their various anticipated motions (including a motion to dismiss) to be heard on April 4, 2017, two days before the upcoming sale. Five days later, Gordon filed a notice of hearing, requesting that her motion for a TRO be heard on April 4, 2017, as well. On March 22, 2017, Gordon filed a motion to strike McMahon-Myhran's declaration and a motion to shorten time so her motion to strike could also be heard on April 4.

On March 27, 2017, the Lenders filed their motion to dismiss and objection to Gordon's motion for a TRO. On that same day, the Lenders also filed a motion to shorten time to hear their motion to dismiss on April 4, 2017. The district court granted all pending motions to shorten time on March 28, 2017.

On April 4, 2017, the district court heard evidence and argument regarding the three motions: the Lenders' motion to dismiss, Gordon's motion for a TRO,[3] and Gordon's motion to strike. Since the district court considered evidence outside of the pleadings, the Lenders' motion to dismiss was treated as a motion for summary judgment under I.R.C.P. 12(d). (As a result, the Lenders' dispositive motion will be referred to as their "converted motion to dismiss.")

On April 5, 2017, the day before the foreclosure sale was to occur, the district court postponed the sale until April 24, 2017. On April 24, 2017, the district court issued an order (the order) denying Gordon's motions and granting the Lenders' converted motion to dismiss. The order stated "the foreclosures sale may proceed[,]" and the sale finally occurred that same day at which it was purchased by credit bid, presumably by U.S. Bank. On April 26, 2017, the district court entered an amended judgment dismissing Gordon's action. Gordon timely appealed. On

---

[3] As will be discussed, Gordon's motion for a TRO was correctly construed by the district court as a motion for a preliminary injunction.

September 22, 2017, this Court denied Gordon's August 28, 2017, motion to stay the amended judgment.

## II. STANDARD OF REVIEW

Because the district court considered matters outside the pleadings, the Lenders' motion to dismiss must be treated as a motion for summary judgment. I.R.C.P. 12(d). This Court employs the same standard as the district court when reviewing a ruling on a summary judgment motion. *La Bella Vita, LLC v. Shuler*, 158 Idaho 799, 805, 353 P.3d 420, 426 (2015) (citing *Wesco Autobody Supply, Inc. v. Ernest,* 149 Idaho 881, 890, 243 P.3d 1069, 1078 (2010)). "The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). "The facts must be liberally construed in favor of the non-moving party." *Tiller White, LLC v. Canyon Outdoor Media, LLC*, 160 Idaho 417, 419, 374 P.3d 580, 582 (2016) (quoting *Capstar Radio Operating Co. v. Lawrence*, 153 Idaho 411, 416, 283 P.3d 728, 733 (2012)). If no genuine issue of material fact exists, and only questions of law remain, this Court exercises free review over such questions. *See Spencer v. Jameson*, 147 Idaho 497, 501, 211 P.3d 106, 110 (2009).

"The interpretation of a statute is a question of law that the Supreme Court reviews de novo." *Hayes v. City of Plummer*, 159 Idaho 168, 170, 357 P.3d 1276, 1278 (2015) (citing *State v. Schulz,* 151 Idaho 863, 865, 264 P.3d 970, 972 (2011)).

## III.    ANALYSIS

A.    **The district court did not abuse its discretion in granting the Lenders' motion to shorten time or in denying Gordon's motion to strike McMahon-Myhran's declaration.**

1. Granting the Lenders' motion to shorten time to hear their motion to dismiss was not an abuse of discretion.

Gordon contends that the district court abused its discretion by granting the Lenders' motion to shorten time and in hearing the converted motion to dismiss on April 4, 2017. Gordon argues that the district court abused its discretion by failing to consider both of her objections to the converted motion, which claimed notice had been untimely. The Lenders respond that the district court properly found good cause to grant their motion to shorten time as allowed by Rule 7(b)(3)(H) of the Idaho Rules of Civil Procedure. Even though the Lenders cite to the wrong rule for the district court's authority, the district court was authorized to shorten time under Rule

6

56(b)(3). As a result, the Lenders are correct that the district court did not abuse its discretion by shortening time.

> When a motion to dismiss under I.R.C.P. 12(b)(6) is converted into a motion for summary judgment, the parties must be given time specified under I.R.C.P. 56([b]) to present relevant materials to the court. The party moving for summary judgment must serve the motion, affidavits, and supporting brief at least twenty-eight days before the hearing, and the adverse party then must serve its affidavits within fourteen days of the hearing. *The court may shorten this time period for good cause.* Deciding whether to shorten time under Rule 56([b]) is subject to the court's discretion. *Sun Valley Potatoes, Inc. v. Rosholt, Robertson & Tucker,* 133 Idaho 1, 6, 981 P.2d 236, 241 (1999).

*Doe v. Idaho Dep't of Health & Welfare*, 150 Idaho 491, 495, 248 P.3d 742, 746 (2011) (italics added) (citations omitted).

When reviewing a decision for an abuse of discretion, this Court considers "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

The purpose of the time requirements of Rule 56(b) is to give the parties "adequate and fair opportunity" to respond. *Sun Valley Potatoes, Inc. v. Rosholt, Robertson & Tucker*, 133 Idaho 1, 5, 981 P.2d 236, 240 (1999). This Court has noted that there are "relevant factors involved in determining [whether] good cause existed to grant" a motion to shorten time. *Brinkmeyer v. Brinkmeyer*, 135 Idaho 596, 601, 21 P.3d 918, 923 (2001). Those factors are: whether the responding party had notice of the motion (or if the motion was unexpected), whether new and unforeseeable factual information was raised by the moving party, how much time the responding party had to respond, and whether the responding party was prejudiced. *See id.; Doe*, 150 Idaho at 496, 248 P.3d at 747; *Sun Valley Potatoes, Inc.*, 133 Idaho at 6, 981 P.2d at 241.

Preliminarily, we note that the district court provided sparse analysis regarding this issue, stating in total that it reviewed the Lenders' motion and "determined that good cause exists for granting such Motion to Shorten Time." Although district courts are typically required to disclose their reasons for discretionary decisions that directly affect the outcome of litigation, a district court need not disclose reasoning when "those reasons are obvious from the record itself." *Quick v. Crane*, 111 Idaho 759, 772, 727 P.2d 1187, 1200 (1986). In addition, an order

7

shortening time does not necessarily directly affect the outcome of litigation. Rather, it is related to the "management of the litigation," and the district court is granted more latitude regarding the need to articulate its reasons under those circumstances. *See id.* at 772 n.3, 727 P.2d at 1200 n.3. Accordingly, the brief analysis undertaken by the district court does not amount to an abuse of discretion.

The first consideration under the abuse of discretion standard has been met here. The district court correctly recognized that the converted motion to dismiss was governed by Rule 56. It has been a long standing rule that deciding whether to shorten time under Rule 56 is a matter of discretion. *See Doe*, 150 Idaho at 495, 248 P.3d at 746; *Sun Valley Potatoes, Inc,* 133 Idaho at 5–6, 981 P.2d at 240–41. We conclude the district court correctly perceived this issue as one of discretion.

The remaining elements on review have been satisfied as well. In this case, the April 4, 2017, hearing was scheduled so that the TRO could be addressed before the foreclosure sale, which was set to occur on April 6, 2017. The Lenders' actual motion to dismiss and motion to shorten time were not filed until March 27, 2017, just eight days before the April 4 hearing. However, Gordon admitted to receiving the Lenders' memorandum in support of their motion to dismiss on March 21, 2017, approximately fourteen days before the hearing. Gordon also filed a twenty-page objection to the motion to dismiss on March 29, 2017.

The factors outlined above were satisfied here because Gordon had notice of the upcoming motion, she was given nearly two weeks in which to respond, there is no evidence that the Lenders announced new or unforeseeable factual information, and Gordon was not prejudiced given her twenty-page objection. Moreover, since the motion for the TRO needed to be heard before the foreclosure sale, judicial economy supported the district court's decision to hear all the motions related to the upcoming foreclosure sale at the same time. Additionally, the purpose of the time requirements of Rule 56—to give the parties adequate and fair opportunity to respond—remained satisfied despite the shortened timeframe. *Sun Valley Potatoes, Inc.*, 133 Idaho at 5, 981 P.2d at 240. Accordingly, the decision to shorten time was within the boundaries of the district court's discretion, consistent with the applicable legal standards, reached by reason, and the court did not abuse its discretion in granting the motion to shorten time.

**2.** Denying Gordon's motion to strike McMahon-Myhran's declaration was not an abuse of discretion.

Gordon next contends that McMahon-Myhran's declaration should have been stricken as it was based in part on hearsay—not personal knowledge. "This Court reviews challenges to the trial court's evidentiary rulings under the abuse of discretion standard." *Dulaney v. St. Alphonsus Reg'l Med. Ctr.*, 137 Idaho 160, 163–64, 45 P.3d 816, 819–20 (2002) (citation omitted). "At any stage of a proceeding, Idaho courts are to 'disregard all errors and defects that do not affect any party's substantial rights.'" *In re Doe*, 163 Idaho 565, 571, 416 P.3d 937, 943 (2018) (quoting I.R.C.P. 61). As a result, in order to prevail, an "appellant must present some argument that a substantial right was" affected by the alleged error. *Id.* (quoting *Hurtado v. Land O'Lakes, Inc.*, 153 Idaho 13, 18, 278 P.3d 415, 420 (2012)).

McMahon-Myhran's declaration merely reintroduced copies of the three admitted postponement scripts. These three scripts were admitted through other affidavits uncontested by Gordon. Consequently, McMahon-Myhran's declaration was ultimately cumulative; even if it had been stricken in its entirety, it would not have altered the record before the trial court. It therefore cannot be said that its inclusion affected Gordon's substantial rights. Therefore, the district court did not abuse its discretion by allowing the declaration to remain in the record.

**B. The district court correctly denied Gordon's requested injunction and appropriately granted summary judgment in favor of the Lenders.**

This case has an unusual procedural background involving the Lenders' converted motion to dismiss on the one hand and Gordon's motion for a TRO that was treated as a motion for a preliminary injunction on the other. These two motions were addressed at the same hearing. Accordingly, we take this opportunity to clarify that the district court's granting of summary judgment properly addressed Gordon's arguments for injunctive relief and properly dismissed her claim.

Initially, Gordon's motion for a TRO was properly construed by the district court as a motion for a preliminary injunction. When Gordon filed her complaint with the district court on January 9, 2017, she moved for a TRO under Rule 65(b) of the Idaho Rules of Civil Procedure. Orders issued pursuant to Rule 65(b) are of short duration (no more than 14 days) because of their extraordinary procedural posture. *See* I.R.C.P. 65(b)(2). At the time, a foreclosure sale was scheduled to occur just two days after the hearing, on January 11, 2017; thus, a motion under Rule 65(b) was appropriate. However, the January 11, 2017, foreclosure sale was postponed by

9

the Lenders.[4] Two months later, on March 15, 2017, Gordon filed a memorandum supporting her motion for the TRO—the memorandum still claimed to be brought under Rule 65(b). However, the Lenders had notice of the requested injunction and were able to present arguments against it. Because the Lenders had been notified of Gordon's requested injunction and the district court held a contested hearing on the matter, Gordon's motion for a TRO was properly characterized as a motion for a preliminary injunction under Rule 65(a). *See Wood v. Wood*, 96 Idaho 100, 101, 524 P.2d 1072, 1073 (1974) ("The function of [a temporary restraining] order is to preserve the status quo during the interim and until a hearing can be held after notice to the adverse party on the application for a preliminary injunction.").

      1.  <u>The district court's summary judgment analysis implicitly addressed Gordon's preliminary injunction arguments.</u>

Despite appropriately categorizing Gordon's motion as a request for a preliminary injunction, the district court analyzed a number of Gordon's arguments under the summary judgment standard. Due to the nature of the grounds for Gordon's proposed preliminary injunction, this was not error.

A party seeking a preliminary injunction bears "the burden of proving the right thereto . . . ." *Harris v. Cassia Cty.*, 106 Idaho 513, 518, 681 P.2d 988, 993 (1984) (citing *Lawrence Warehouse Co. v. Rudio Lumber Co.,* 89 Idaho 389, 405 P.2d 634 (1965)). "Whether to grant or deny a preliminary injunction is a matter for the discretion of the trial court." *Brady v. City of Homedale*, 130 Idaho 569, 572, 944 P.2d 704, 707 (1997) (citing *Harris*, 106 Idaho at 517, 681 P.2d at 992). A district court should grant a preliminary injunction "only in extreme cases where the right is very clear and it appears that irreparable injury will flow from its refusal." *Id.* (quoting *Harris*, 106 Idaho at 518, 681 P.2d at 993).

Rule 65(e) enumerates the grounds upon which a district court may grant a preliminary injunction. I.R.C.P. 65(e). Gordon posited, below and on appeal, three substantive arguments to support her proposed injunction. All three arguments implicate subsection 65(e)(1). That section authorizes a district court to grant a preliminary injunction "when it appears by the complaint that the plaintiff is entitled to the relief demanded, and that relief, or any part of it, consists of restraining the commission or continuance of the acts complained of, either for a limited period

---

[4] This postponement is not contested on appeal.

or perpetually[.]" I.R.C.P. 65(e)(1). This Court, has announced the following rules regarding subsection (e)(1): The moving party must

> demonstrate that based on their complaint, they were entitled to the relief they demanded, and as such were likely to prevail at trial. The substantial likelihood of success necessary to demonstrate that . . . [the moving party is] entitled to the relief . . . demanded cannot exist where complex issues of law or fact exist which are not free from doubt.

*Harris*, 106 Idaho at 518, 681 P.2d at 993 (analyzing an earlier yet substantively identical version of Rule 65(e)(1)).

Accordingly, when an argument for a preliminary injunction is based on entitlement to the requested relief, such as the case is here, a sufficient showing by the party opposing the injunction that it is entitled to summary judgment necessarily defeats the moving party's ability to demonstrate the requisite likelihood of success. In other words, the legal effect of the district court's conclusion that the Lenders were entitled to summary judgment would unavoidably result in the rejection of Gordon's motion for a preliminary injunction.

On appeal, we review the district court's dismissal of Gordon's complaint under the summary judgment standard, with the understanding that such dismissal implicitly found Gordon's argument could not support the requested preliminary injunction.

2. The alleged postponement error was not a sufficient basis to delay the foreclosure sale.

In support of her effort to enjoin the foreclosure sale, Gordon argued that the Lenders failed to properly cry and postpone the foreclosure sale on February 9, 2017. The district court noted conflicting evidence in the matter and inferred that the postponement had been properly cried. Gordon continues to argue on appeal that the postponement was not properly cried and that the inference drawn by the district court was improper. The Lenders contend that the district court properly inferred that the foreclosure sale was postponed in accordance with Idaho Code section 45-1506(8). In the alternative, they argue that even if the postponement did not occur as determined by the district court, section 45-1508 does not allow Gordon to undo the later foreclosure sale. The Lenders argue that whatever transpired at the earlier postponement is immaterial given subsequent events. We agree.

Section 45-1506(8) establishes the relevant procedure for providing notice regarding postponement of a foreclosure sale. It reads, "The trustee may postpone the sale of the property

11

upon request of the beneficiary by publicly announcing at the time and place originally fixed for the sale the postponement to a stated subsequent date and hour." I.C. § 45-1506(8). The purpose of section 1506(8) is to give a debtor notice that the sale date has been postponed so she may protect her interest in the property at the rescheduled sale. *See Black Diamond All., LLC. v. Kimball*, 148 Idaho 798, 801, 229 P.3d 1160, 1163 (2010).

There is no dispute that Gordon received notice of, and seemingly acquiesced to, the two later postponements—the final of which was pronounced by the district court. At the end of the day, Gordon had actual notice of the final sale. Actual notice afforded her the protection contemplated by the legislature in Idaho Code section 45-1506(8). She was able to protect her interest in the property at the rescheduled sale. Accordingly, any alleged error occurring at the February 9, 2017, postponement was remedied through the later notices of and Gordon's apparent acquiescence to the later postponements because she was properly informed. *See Black Diamond*, 148 Idaho at 801, 229 P.3d at 1163.

The determination that Gordon's later acquiescence to the subsequent postponements remedied any alleged error in the postponement procedure is supported by Idaho Code section 45-1508. Section 45-1508 establishes when foreclosure sales become final despite defects in notice proceedings. That statute reads,

> FINALITY OF SALE. A sale made by a trustee under this act shall foreclose and terminate all interest in the property covered by the trust deed of all persons to whom notice is given under section 45-1506, Idaho Code, and of any other person claiming by, through or under such persons and such persons shall have no right to redeem the property from the purchaser at the trustee's sale. The failure to give notice to any of such persons by mailing, personal service, posting or publication in accordance with section 45-1506, Idaho Code, shall not affect the validity of the sale as to persons so notified *nor as to any such persons having actual knowledge of the sale*. Furthermore, any failure to comply with the provisions of section 45-1506, Idaho Code, shall not affect the validity of a sale in favor of a purchaser in good faith for value at or after such sale, or any successor in interest thereof.

I.C. § 45-1508 (italics added). The Lenders claim that section 45-1508, along with *Spencer v. Jameson*, 147 Idaho 497, 211 P.3d 106 (2009), dictate that the completed foreclosure sale should not be invalidated or reversed—despite any alleged error in postponement or purported violation of section 45-1506(8). The Lenders are correct and *Spencer* is instructive.

Like the case at bar, the debtor in *Spencer* received proper notice of the initial foreclosure sale. *Spencer*, 147 Idaho at 500, 211 P.3d at 109. Also like this case, the sale in *Spencer* was

12

alleged to have violated a separate subsection of 45-1506 not involving the service or publication of the initial notice; the lender had violated subsection (9) by placing a credit bid over the amount owed under the promissory note at the time of the foreclosure sale. *Id.* at 503, 211 P.3d at 112 (citing *Fed. Home Mortg. Corp. v. Appel*, 143 Idaho 42, 45, 137 P.3d 429, 432 (2006)). Despite this violation of section 45-1506(9), this Court interpreted section 45-1508 and found that the sale was final. *Id.* at 504, 211 P.3d at 113. We reasoned that it was not the legislature's intent to set aside a sale for a credit bid violation when no notice of a violation of service and publication under section 45-1506(2)–(6) had occurred and a separate remedy existed under section 45-1507 for the credit bid violation. *Id.* These two rationales remain valid here.

First, there is no dispute about the propriety of the initial notice of the foreclosure sale: service and publication under section 45-1506(2)–(6) were properly completed. Nor is there any dispute that Gordon received *actual* notice of the two later postponements—the latter of which was pronounced by the district court. Thus, Gordon had actual notice of the sale.

Second, and as noted, the subsequent uncontested postponements and actual notice of the sale rendered any initial failure to properly cry the February 9, 2017, postponement immaterial. These proper subsequent procedures remedied any prior problems with whatever transpired at the February 9, 2017, postponement. As a result, the completed foreclosure sale will not be undone merely because Gordon contends the postponement that occurred months before the sale was somehow improper. *See Spencer*, 147 Idaho at 503, 211 P.3d at 112. Accordingly, Gordon's argument that a postponement error occurred is not a basis to undo what was done. Because subsequent events rendered the earlier postponement immaterial, it was unnecessary for the district court to make a factual finding regarding the earlier postponement. It does not provide a basis to conclude the district court's rejection of Gordon's motion for a preliminary injunction was in error.

3. The Lenders' failure to record a power of attorney did not invalidate the foreclosure procedures, nor did it provide grounds to enjoin the sale.

On January 28, 2016, SPS (the loan servicer) executed an Appointment of Successor Trustee, appointing McMahon-Myhran as successor trustee under the trust deed. This appointment was recorded in Blaine County, Idaho, on February 8, 2016. SPS did so as U.S.

13

Bank's attorney-in-fact. However, no power of attorney appointing SPS[5] as U.S. Bank's attorney-in-fact had been previously recorded in Blaine County. Months later, McMahon-Myhran recorded the initial Notice of Default on August 31, 2016, and executed the Notice of Sale on September 6, 2016.

Gordon claims that Idaho Code section 55-806 required U.S. Bank to record a power of attorney in Blaine County, granting SPS the authority to act as the bank's attorney-in-fact when it appointed McMahon-Myhran; the bank failed to do so. Gordon thus contends that the failure to record the power of attorney violated Idaho Code section 55-806, thereby rendering SPS's appointment of McMahon-Myhran as trustee ineffectual. Gordon contends the ensuing sale was invalid because McMahon-Myhran did not have the requisite authority to effect the foreclosure procedures. The district court found the failure to record the power of attorney did not invalidate the sale, as such a prior recording was not required in this case. The district court was correct in its determination.

Our analysis begins with an interpretation of Idaho Code section 55-806. "Statutory interpretation begins with the literal language of the statute and provisions should not be read in isolation, but must be interpreted in the context of the entire document." *Hayes*, 159 Idaho at 170, 357 P.3d at 1278 (quotation marks and citation omitted). When interpreting statutes, the objective is to give effect to legislative intent, which should be derived from the whole act at issue. *Farmers Nat'l Bank v. Green River Dairy, LLC*, 155 Idaho 853, 856, 318 P.3d 622, 625 (2014) (citations omitted). A statute's title may be consulted for context when the statute is ambiguous or when the title's conformity to Article III, Section 16 of the Idaho Constitution is brought into question. *Federated Publ'ns, Inc. v. Idaho Bus. Review, Inc.*, 146 Idaho 207, 211, 192 P.3d 1031, 1035 (2008), *abrogated on other grounds by Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 265 P.3d 502 (2011). As an extension of *Federated Publications, Inc.*, we find that the title of a statutory section may be consulted for context when the statute is otherwise unambiguous.[6]

---

[5] Gordon correctly noted that the district court incorrectly stated that MERS, as the beneficiary of the trust deed, appointed SPS as its attorney-in-fact. MERS had ceased being the beneficiary under the trust deed when it was assigned to U.S. Bank on November 7, 2012. It appears that Chase, SPS's predecessor as loan servicer, somehow granted SPS a limited power of attorney—not MERS. However, given the conclusion reached by this Court, this inaccuracy is irrelevant, as a failure to record a power of attorney in this instance does not invalidate the foreclosure sale.

[6] As the Court of Appeals has correctly noted, the title of a statutory section is part of the act to be considered; however, it cannot be used to create ambiguity. *State v. Williston*, 159 Idaho 215, 219, 358 P.3d 776, 780 (Ct. App.

Idaho Code section 55-806, which requires recordation of powers of attorney in certain circumstances, reads as follows: "POWER MUST BE RECORDED BEFORE CONVEYANCE BY ATTORNEY. An instrument executed by an attorney in fact must not be recorded until the power of attorney authorizing the execution of the instrument is filed for record in the same office." I.C. § 55-806. Although the language of this statute appears broad on its face, suggesting *any instrument* signed by an attorney-in-fact has to be preceded by a recorded power of attorney, the surrounding statutory sections, and the title of section 55-806, show this is not the case, and a prior recording was not required here.

There is no requirement to record a power of attorney if the document signed by the attorney-in-fact does not affect an interest in real property. First, section 55-801, of Chapter 8 titled "Recording Transfers," notes the type of instruments that are subject to the recording rules and may be recorded. I.C. § 55-801. It reads, "[a]ny instrument or judgment *affecting the title to or possession of real property* may be recorded under this chapter.*" Id.* (italics added). Second, the title of section 55-806 further demonstrates that a power of attorney need only be recorded prior to the "conveyance" by the attorney-in-fact. I.C. § 55-806 ("POWER MUST BE RECORDED BEFORE CONVEYANCE BY ATTORNEY."). Section 55-813 then defines conveyance: "The term 'conveyance' as used in this chapter, embraces every instrument in writing by which any estate or interest in real property is created, alienated, mortgaged or encumbered, or by which the title to any real property may be affected, except wills." I.C. § 55-813. When read in conjunction, these sections require only that a power of attorney be recorded before an attorney-in-fact executes an instrument that affects an estate or interest in real property.

Here, the instrument signed by the attorney-in-fact, SPS, merely names a new trustee under the trust deed. All that appointment did was change the identity of a previously established trustee—no interest in real property was altered in any way, as the trust deed already established the trustee's rights and duties. A mere change in what entity may perform those established duties did not affect any real property interests; therefore, section 55-806 was not implicated and no prior recording needed to occur. Furthermore, the appointment was permitted under the trust deed itself and Idaho Code section 45-1504(2).

2015); *State v. Peterson,* 141 Idaho 473, 476, 111 P.3d 158, 161 (Ct. App. 2004); *State v. Browning,* 123 Idaho 748, 750, 852 P.2d 500, 502 (Ct. App. 1993).

15

Moreover, "[t]he primary purpose of the recording statutes is to give notice to others that an interest is claimed in real property . . . ." *Matheson v. Harris*, 98 Idaho 758, 761, 572 P.2d 861, 864 (1977). Thus, the failure to record a power of attorney does not void a conveyance between the parties involved; it merely renders the recorded conveyance ineffectual as notice to subsequent purchasers. *See Hunt v. McDonald*, 65 Idaho 610, 149 P.2d 792 (1944) (analyzing the predecessor to I.C. § 55-806, section 54-806, I.C.A.); I.C. § 55-815. Accordingly, in recognizing that the purpose of recording instruments is to give subsequent purchasers notice, the United States District Court for the District of Idaho has twice held, in similar circumstances, that the appointment of a successor trustee by an attorney-in-fact, without a prior recorded power of attorney, was valid and did not undermine a foreclosure sale as to the original debtor. *Rheinschild Family Tr. v. Rankin*, No. 1:15-CV-00194-EJL, 2016 WL 1170945, at *8 (D. Idaho Mar. 24, 2016) ("[A]n appointment of successor trustee is legally valid between the parties to the appointment even if the power of attorney was not recorded." (citing *Purdy v. Bank of Am.*, No. 1:11-CV-00640-EJL, 2012 WL 4470938, *5 (D. Idaho 2012))).

In conclusion, the recording rule in section 55-806 does not apply to the appointment of a successor trustee in this case, and even if recording the power of attorney were required, the failure to do so would not invalidate the foreclosure sale as between Gordon and the beneficiary of the trust deed. Accordingly, this argument does not supply grounds for Gordon's injunctive relief, and the district court did not err in denying that relief.

4. There are no genuine issues of material fact suggesting the Lenders violated federal law or engaged in dual tracking; thus, this allegation was an insufficient basis for enjoining the sale.

Gordon's last ground for injunctive relief alleges that the Lenders violated federal law by engaging in dual tracking. The Lenders reply that they complied with all applicable federal regulations and that Gordon has failed to raise a genuine issue of material fact as it relates to the Lenders' compliance with federal law.

"A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, . . . or [by] showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." I.R.C.P. 56(c)(1). Thus, "the party opposing summary judgment must bring to the trial court's attention evidence that may create a genuine issue of material fact . . . ." *Beus v. Beus*, 151 Idaho 235, 239, 254 P.3d 1231, 1235 (2011) (citing *Esser Elec. v. Lost River Ballistics Techs., Inc.,* 145 Idaho 912, 919, 188

16

P.3d 854, 861 (2008)). Mere conclusory allegations will not raise a genuine issue of material fact. *See Valiant Idaho, LLC v. VP Inc.*, 164 Idaho 314, 326, 429 P.3d 855, 867 (2018) (citing *Stafford v. Weaver*, 136 Idaho 223, 225, 31 P.3d 245, 247 (2001)).

Dual tracking, where a "lender actively pursues foreclosure while simultaneously considering the borrower for loss mitigation options[,]" is prohibited by section 1024.41(g) of title 12 of the Code of Federal Regulations. *Gresham*, 642 Fed. App'x at 359. While the district court quoted and seemingly analyzed section 1024.41(g), subsection (g) is not applicable here. Section 1024.41(g) states, in pertinent part,

> If a borrower submits a complete loss mitigation application[7] *after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process* but more than 37 days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale unless [one of the enumerated circumstances has occurred.]

12 C.F.R. § 1024.41(g) (italics added).

The facts of this case do not implicate subsection (g): Gordon's second modification application (or loss mitigation application), which was denied based on her corrected income, was denied on September 15, 2015. The unrescinded Notice of Default was not filed until almost a year later on August 31, 2016, well after the completed, accurate modification application had been denied. Thus, the second (and only fully completed and accurate) modification application was not submitted "after a servicer . . . made the first notice or filing required . . . for any . . . non-judicial foreclosures process . . . ." 12 C.F.R. § 1024.41(g).

Gordon's final (third) modification application, which was still open for review *after the filing of the notice* of default, does not implicate subsection (g) either. That application was never completed as required by subsection (g), nor was SPS even required to evaluate that latter application at all, since SPS evaluated Gordon's second modification application and Gordon had remained delinquent on her mortgage. 12 C.F.R. § 1024.41(i).[8] Accordingly, no violation occurred regarding Gordon's third modification, and subsection (g) is not applicable to it either.

---

[7] "A complete loss mitigation application means an application in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower. A servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application." 12 C.F.R. § 1024.41(b)(1).

[8] Subsection (i) reads, "A servicer must comply with the requirements of this section for a borrower's loss mitigation application, unless the servicer has previously complied with the requirements of this section for a complete loss mitigation application submitted by the borrower and the borrower has been delinquent at all times since submitting the prior complete application."

However, 12 C.F.R. Section 1024.41(f), which bars dual tracking when an application is submitted *before* a notice of default is filed, does apply here. Even so, there is no evidence the Lenders failed to comply with subsection (f). The relevant portion of subsection (f) states,

> If a borrower submits a complete loss mitigation application . . . *before a servicer has made the first notice or filing* required by applicable law for any judicial or non-judicial foreclosure process, a servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless:
>
> (i) The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied[.]

12 C.F.R. § 1024.41(f)(2) (italics added). Accordingly, a loan servicer has complied with subsection (f) and is allowed to initiate foreclosure proceedings once it (1) gives proper notice under subsection (c)(1)(ii) to the borrower that she is not eligible for any loss mitigation option but has the right to appeal, and (2) either gives the borrower notice that the appeal process was not applicable, the borrower fails to request an appeal within the notified time frame, or the appeal has been properly denied. *Id.*

Gordon contends SPS erred in denying her first modification application because it was rejected based on an incorrect income calculation, suggesting SPS may not have exercised reasonable diligence in obtaining correct income documentation. Specifically, she alleges that the Lenders violated 12 C.F.R. § 1024.35 by "ignoring" her notice of error. Gordon maintains SPS was required to conduct a "reasonable investigation" and was authorized to request documentation of Gordon's trust income when Gordon filed her first notice of error. 12 C.F.R. § 1024.35(e)(1)(i)(B) & (e)(2)(ii). SPS did not do this at that time. However, this error was remedied in the second application, when Gordon's trust income was properly analyzed. If no second application had taken place, SPS's failure would have provided a basis to enjoin the foreclosure process. 12 C.F.R. § 1024.35(e)(1)(i)(A). However, SPS corrected its oversight long before both the recording of the Notice of Default and foreclosure sale. Accordingly, this error did not amount to dual tracking.

Regarding Gordon's second modification application, SPS satisfied the first requirement of Section 1024.41(f) on September 15, 2015, by providing Gordon with written notice that she

18

was not eligible for any loss mitigation options and that she could appeal the denial within thirty days. The second requirement was also satisfied because Gordon never requested an appeal of her second denial within thirty days. Although Gordon continued to correspond with SPS about the September 15, 2015, denial, and appears to have requested a third modification that was never completed and subsequently closed by SPS on December 7, 2016, she did not appeal the September 15, 2015, denial. As a result, the Lenders did not violate subsection (f) when they began foreclosure proceedings by recording the Notice of Default on August 31, 2016, over nine months after Gordon was required to have submitted her appeal.

Gordon did attempt to appeal the denial of her third application on January 5, 2017. However, this appeal was too little, too late, as far as the federal regulations were concerned. As noted, Gordon's third application was inapplicable for purposes of preventing the foreclosure sale because 12 C.F.R. § 1024.41(i) only required SPS to consider one completed modification application, which it did with her second application. Thus, Gordon had no right to appeal an incomplete modification application that SPS had no obligation to review in the first place. Consequently, Gordon has not raised a genuine issue of material fact suggesting the Lenders violated section 1024.41.

Finally, Gordon claims that the district court's summary judgment must be vacated because it found dual tracking was legal in Idaho,[9] which would amount to a violation of the Supremacy Clause, as dual tracking is prohibited by federal law. Although the district court cited the incorrect federal regulation, it nonetheless analyzed federal law and reached the correct conclusion, ensuring federal law applied in accordance with the Supremacy Clause.

In conclusion, all three of Gordon's arguments in support of her injunctive relief fail as a matter of law. The district court was therefore correct in granting summary judgment and dismissing her claim for injunctive relief.

---

[9] Although it is ultimately immaterial to Gordon's appeal, we take this opportunity to clarify that the Idaho Legislature has provided certain limited protections against dual tracking. Idaho Code section 45-1506C(3) provides some protection against a lender conducting a foreclosure sale, in certain circumstances, and states, "A trustee's sale for the property subject to the loan may not occur until after the beneficiary or the beneficiary's agent timely responds to" a properly requested loan modification. I.C. § 45-1506C(3).

**C.** **The district court correctly dismissed Gordon's breach of the covenant of good faith and fair dealing claim, as Gordon failed to raise any genuine issue of material fact that the Lenders had violated the covenant.**

The district court found that there was no breach of the implied covenant of good faith and fair dealing because the Lenders merely acted in accordance with the note and trust deed. As a result, the district court dismissed Gordon's related claims.

On appeal, Gordon claims that the Lenders violated the covenant of good faith and fair dealing by committing a litany of actions listed below. Regardless, Gordon does not appear to cite to or analyze any Idaho law regarding these allegations. Moreover, her arguments are largely conclusory and her record citations are to her own conclusory statements made in her affidavits and letters. Accordingly, she has failed to meet her burden of raising a genuine issue of material fact.

"A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, . . . or [by] showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." I.R.C.P. 56(c)(1). "[T]he party opposing summary judgment must bring to the trial court's attention evidence that may create a genuine issue of material fact . . . ." *Beus*, 151 Idaho at 239, 254 P.3d at 1235. Mere conclusory allegations will not raise a genuine issue of material fact. *See Valiant Idaho*, 164 Idaho at 326, 429 P.3d at 867. Likewise, a "mere scintilla of evidence or only slight doubt as to the facts is not sufficient to create a genuine issue of material fact for the purposes of summary judgment." *La Bella Vita, LLC*, 158 Idaho at 805, 353 P.3d at 426 (quoting *Van v. Portneuf Med. Ctr.*, 147 Idaho 552, 556, 212 P.3d 982, 986 (2009)).

"Idaho law recognizes a cause of action for breach of an implied covenant of good faith and fair dealing." *Jenkins v. Boise Cascade Corp.*, 141 Idaho 233, 242, 108 P.3d 380, 389 (2005). The implied covenant of good faith and fair dealing requires parties in a contract "to perform, in good faith, the obligations required by their agreement, and a violation of the covenant occurs when either party violates, nullifies or significantly impairs any benefit of the contract." *Fox v. Mountain W. Elec., Inc.*, 137 Idaho 703, 710–11, 52 P.3d 848, 855–56 (2002). A party does not breach the covenant of good faith and fair dealing "by merely exercising its express rights" under the contract in question. *First Sec. Bank of Idaho, N.A. v. Gaige*, 115 Idaho 172, 176, 765 P.2d 683, 687 (1988). In addition, "[n]o covenant will be implied which is contrary to the terms of the contract negotiated and executed by the parties."

20

*Idaho Power Co. v. Cogeneration, Inc.*, 134 Idaho 738, 750, 9 P.3d 1204, 1216 (2000); *see also Clement v. Farmers Ins. Exch.,* 115 Idaho 298, 300, 766 P.2d 768, 770 (1988) (explaining an implied covenant of good faith and fair dealing cannot override an express provision in a contract).

Gordon contends the following acts by the Lenders amounted to a breach of the covenant: (1) encouraging her to stop paying her mortgage to apply for a modification; (2) not fairly or reasonably considering her applications (i.e., inviting Gordon to participate in an illusory loan modification process); (3) transferring her to a different loan servicer to start the modification process over; (4) requiring her to resubmit documentation she had already submitted, (5) employing dual tracking; (6) denying her modification "on the eve of foreclosures based on falsely contrived grounds, as a strategy" to obtain the property; (7) blocking her from accessing information about her loan, charges, and penalties; (8) making misstatements to Gordon, the district court, and this Court; and (9) prolonging the entire process in order to compound her debt with penalties and interest. Gordon's numerous allegations will be dealt with in turn, each of which fail to establish any genuine issue of material fact as far as the covenant of good faith and fair dealing is concerned.

Gordon admits that the first act was allegedly committed by Chase, which is not a party to this case. It is therefore clear this action could not amount to bad faith on the part of the Lenders.

Second, the Lenders have provided evidence that they properly evaluated Gordon's accurately calculated income and determined that her income was not adequate to permit a modification. Specifically, SPS wrote, "We are unable to offer you a modification because we are unable to create an affordable payment equal to 31% of your reported monthly gross income without changing the terms of your account beyond the requirements of the program." Accordingly, SPS fairly examined Gordon's modification; Gordon's conclusory allegations otherwise do not raise a genuine issue of material fact as to this issue. *See Valiant Idaho, LLC*, 164 Idaho at 326, 429 P.3d at 867.

Gordon's third allegation fails because the beneficiary's right to transfer the loan to a new servicer is explicitly authorized in the trust deed and a party cannot breach the implied covenant by acting pursuant to the terms of the contract. *First Sec. Bank of Idaho, N.A.,* 115 Idaho at 176, 765 P.2d at 687.

It is unclear how Gordon's fourth allegation, that she was required to resubmit documents, might have "violate[d], nullifie[d] or significantly impair[ed] any benefit of" hers under the contract. *Fox,* 137 Idaho at 711, 52 P.3d at 856. Although it may have been aggravating, this act does not rise to the level of a breach of the covenant.

Fifth, it has already been shown that the Lenders did not commit dual tracking; their compliance with federal law does not amount to a breach of good faith.

Sixth, although SPS denied Gordon's third modification application on December 7, 2016, a little over a month before the scheduled January 11, 2017, foreclosure sale, Gordon's application was incomplete, and Gordon has not shown otherwise. SPS was therefore entitled to deny that application. Moreover, SPS had already denied her second modification on proper grounds on September 15, 2015, over a year prior to the January 11, 2017, foreclosure sale. Accordingly, the Lenders were within their rights under the trust deed and the note to foreclose on the property in the way that they did.

Seventh, Gordon only cites to conclusory allegations that the Lenders denied her access to her accounts and loan information. This is not enough to avoid summary judgment on her claim. *Valiant Idaho, LLC*, 164 Idaho at 326, 429 P.3d at 867.

Eighth, although SPS admittedly made an error in its review of the earliest loan modification, the error was corrected when it analyzed Gordon's second application. After reviewing all of the correspondences from SPS to Gordon and her attorney, no material misstatements by the Lenders have been identified. Instead, it appears that Gordon thought her third modification should have prolonged foreclosure, and, when it did not, she was caught off-guard. Accordingly, Gordon has not pointed out any misstatements amounting to a breach of the covenant of good faith or fair dealing.

Finally, although the process leading up to the foreclosure was very lengthy, it appears the Lenders acted in accordance with the trust deed, note, and the law. Gordon has not demonstrated any specific violation of the trust deed or note amounting to improper fees or penalties, nor has she pointed out any specific action by the Lenders that was prohibited by the trust deed or note. In addition, most if not all of the delay is attributable to Gordon. She stopped payment on her mortgage in 2012. The foreclosure sale did not occur until 2017. Over the years, there were numerous tactics employed by Gordon that extended this process and effectively

22

allowed her to remain in the home for free. The record does not support Gordon's contention that the Lenders unduly delayed this process.

In the end, Gordon has not carried her burden of demonstrating a genuine issue of material fact regarding any breach of the covenant. As a result, the district court properly dismissed Gordon's claim of a breach of the covenant of good faith and fair dealing.

**D.      The Lenders are entitled to attorney fees on appeal.**

The Lenders request attorney fees on appeal based on Idaho Code sections 12-120(3), 12-121, and the express terms of the note and trust deed. Attorney fees on appeal may be awarded to the prevailing party when the parties contemplated such fees in the underlying contract. *Zenner v. Holcomb*, 147 Idaho 444, 452, 210 P.3d 552, 560 (2009). "Such provisions are ordinarily to be honored by the courts." *Id.* (quoting *Holmes v. Holmes,* 125 Idaho 784, 787, 874 P.2d 595, 598 (Ct. App. 1994)).

Here, the trust deed and the note provide for an award of attorney fees to the Lenders on appeal. The trust deed states, "Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided[,] . . . including, but not limited to, reasonable attorney fees . . . ." The note reads, "If the Note Holder has required [Gordon] to pay immediately in full as described above, the Note Holder will have the right to be paid back by [Gordon] for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney fees." SPS declared all sums owing and due immediately in its notice of default, as required for an award of attorney fees under the note. Accordingly, because the Lenders have prevailed on appeal, they are awarded their reasonable attorney's fees based on the terms of trust deed and the note. *Zenner*, 147 Idaho at 452, 210 P.3d at 560.

## IV. CONCLUSION

For the foregoing reasons, the district court's amended judgment dismissing Gordon's claims is affirmed. Attorney fees and costs on appeal are awarded to the Lenders.

Chief Justice BURDICK, Justices BEVAN, MOELLER and Justice Pro Tem TROUT CONCUR.